1        IN THE UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF VIRGINIA
2                  ROANOKE DIVISION

3    ****************************************************************
     **UNITED STATES OF AMERICA,**
4
              Plaintiff,          **CRIMINAL NO.: 7:21MJ166**
5                                 December 17, 2021
                                  Roanoke, Virginia
6                                 Initial Appearance and
     -v-                          Detention Hearing
7
     **JERALD FRANCIS GRAY,**            Before:
8                                 **ROBERT S. BALLOU**
                                  UNITED STATES MAGISTRATE JUDGE
9            Defendant.          WESTERN DISTRICT OF VIRGINIA

10   ****************************************************************
     APPEARANCES:
11
     For the Plaintiff:
12
     **MAGGIE CLEARY**
13   United States Attorneys Office
     310 First Street SW, 9th Floor
14   Roanoke, VA 24011
     540-857-2250
15   maggie.cleary@usdoj.gov

16   For the Defendant:

17   **CHRISTINE LEE**
     Federal Public Defender for the Western District of Virginia
18   210 First Street SW, Ste 400
     Roanoke, VA 24011
19   540-777-0888
     christine_lee@fd.org

20

21   _____

22            Brittany Davis - FTR Recorder
              Mary J. Butenschoen - Transcriber
23

24   PROCEEDINGS TAKEN BY FTR; TRANSCRIBED USING COMPUTER-AIDED
     TRANSCRIPTION
25

1                                    INDEX

2    WITNESS NAME                                                PAGE

3    FOR THE GOVERNMENT:

4    **LYNNE WITT**

5       Direct Examination By Ms. Cleary.......................... 11

6       Cross-examination By Ms. Lee.............................. 20

7       Redirect Examination By Ms. Cleary ....................... 29

8    FOR THE DEFENDANT:

9    **KIMBERLY FALATIC**

10      Direct Examination By Ms. Lee ............................ 30

11

12

13

14

15                              *   *   *   *   *

16

17

18

19

20

21

22

23

24

25

1   (Proceedings commenced 3:11 p.m.)

2              THE COURT:  Mr. Gray, my name is Robert Ballou.  I'm

3   magistrate judge here in the Western District of Virginia.  Let

4   me start by -- first of all by asking Ms. Davis to call the

5   case, please.

6              THE CLERK:  *United States of America v. Jerald*

7   *Francis Gray,* Criminal Action Number 7:21MJ166.

8              THE COURT:  Let the record reflect the government is

9   present by its counsel and defendant, likewise, is present

10  along with counsel.

11             Mr. Gray, good afternoon.  Like I said, my name is

12  Robert Ballou.  I'm magistrate judge here in the Western

13  District of Virginia.  We're heard today in connection with a

14  new criminal complaint that's been filed as to a Jerald Francis

15  Gray.  Let me introduce you to everyone who is on the screen

16  here so you'll know who they are and what their role is, and

17  then we'll get about to your hearing.  Of course, we have your

18  attorney, Ms. Lee.  Ms. Cleary is the United States Attorney

19  involved in your case.  Lynne Witt is the government law

20  enforcement agent with the FBI that's involved in your case.

21  Ms. Falatic is with our probation office.  You may have spoken

22  with her or one of her colleagues in advance of today's

23  hearings.  And Ms. Davis, she's our courtroom deputy who

24  coordinates these proceedings.

25             You can see a black box that says "Judge Ballou's

USA v. Jerald Francis Gray - 12/17/2021                4

```
1    public line".  That's in the event that anyone wishes to listen

2    to today's proceedings, they can certainly do so, but they can

3    not participate, but they can hear everything that's ongoing.

4              All right.  So let me start, Mr. Gray, by asking you

5    to state your full name for me, please, sir.

6              THE DEFENDANT:  Jerald Francis Gray.

7              THE COURT:  How old are you, sir?

8              THE DEFENDANT:  49.

9              THE COURT:  How far did you go in school?

10             THE DEFENDANT:  I graduated high school.

11             THE COURT:  All right.  Fair to say you read and

12   write English?

13             THE DEFENDANT:  Sir?

14             THE COURT:  Do you read and write English without a

15   problem?

16             THE DEFENDANT:  Yes.

17             THE COURT:  Very well.  And today you feel

18   clearheaded and understand where you are and why you're here?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  All right.  Mr. Gray, you're entitled to

21   have this hearing before me in person if you wish to do so.  We

22   can proceed by videoconference only with your agreement and

23   permission.

24             Do you understand that?

25             THE DEFENDANT:  Yes, sir.
```

1          THE COURT:  Do I have your permission to proceed by

2     way of videoconference?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  All right.  Ms. Lee, on behalf of

5     Mr. Gray, do I have your permission to proceed by way of

6     videoconference?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Thank you very much.  So Mr. Gray, the

9     Fifth Amendment of the Constitution guarantees you the right to

10    remain silent.  You don't have any obligation at all to make

11    any statements about these charges or to answer any questions

12    put to you by the government or its investigating officers, its

13    agents, or its attorneys.  You do not have to participate in

14    the government's investigation.  The fact of the matter is you

15    never have to take the stand to testify unless you choose to do

16    so.

17         I will advise you that if you choose to waive your

18    right to remain silent, if you wish to make any statements or

19    answer any questions or if you don't wish to testify today or

20    any other time in the future, anything that you say can be used

21    against you.

22         Do you understand this?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  Now, the Sixth Amendment of the

25    Constitution gives you the right to be represented by an

1    attorney who will assist you in understanding the nature of the

2    charges you face in challenging the government's evidence, as

3    well as confronting and cross-examining the government's

4    witnesses.  Likewise, an attorney will assist you with

5    preparing and presenting any defenses that you may have to

6    these charges.  You can hire any lawyer that you see fit to

7    represent you, but if you cannot afford an attorney the

8    government will appoint one for you at its expense.

9            Do you understand this?

10           THE DEFENDANT:  Yes, sir.

11           THE COURT:  I do have your financial affidavit that

12   you've completed when you spoke with probation by telephone.

13   Am I correct that you wish to have me appoint an attorney for

14   you?

15           THE DEFENDANT:  Yes, sir.

16           THE COURT:  All right.  On that financial affidavit,

17   understand you have an obligation to provide information that

18   is truthful and correct to the best of your knowledge.

19   Otherwise it may be considered a separate felony offense for

20   providing false information under oath.

21           Do you understand that?

22           THE DEFENDANT:  Yes, sir.

23           THE COURT:  And is the information that you provided

24   to the probation officer true and correct to the best of your

25   knowledge?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  All right.  So based upon the allegations

3     that are set forth in the complaint, based upon your affidavit,

4     I find you qualified to have counsel appointed.  I'm going to

5     appoint Ms. Lee to be your attorney, and she'll represent you

6     for as long as this matter is pending.

7          So Mr. Gray, this is a one-count criminal complaint

8     that alleges a charge of possession of child pornography in

9     violation of 18 United States Code, Section 2252(a)(4).  The

10    complaint -- have you received a copy of it?

11         THE DEFENDANT:  No, sir.

12         THE COURT:  Okay.  We will have that emailed to you

13    there at Western Virginia.  Ms. Lee, you now have a copy of the

14    complaint.  Am I correct about that?

15         MS. LEE:  Yes, Your Honor.

16         THE COURT:  All right.  First of all, is there -- is

17    there any objection to sending the complaint to Mr. Gray there

18    at Western Virginia?  Sometimes complaints of this nature you

19    do not want in the jail.

20         MS. CLEARY:  I don't believe so.  Let me ask agent

21    Witt, is that correct?

22         MS. LEE:  No, it's not up to you.

23         THE COURT:  No, it's --

24         MS. CLEARY:  Oh, sorry.

25         THE COURT:  It's more of a question -- it's a

1    question of Ms. Lee.  It's for Mr. Gray's safety.

2              MS. CLEARY:  Got it.

3              MS. LEE:  Mr. Gray, they are going to send it to you

4    unless you don't want this type of paperwork in the jail.  I

5    usually say you don't want it in the jail.

6              THE DEFENDANT:  That's fine, yes.

7              MS. LEE:  Okay.

8              THE COURT:  Let's -- let's not do that.  Ms. Lee, you

9    have had an opportunity to go over the --

10             MS. LEE:  Yes.

11             THE COURT:  -- the complaint with Mr. Gray?

12             MS. LEE:  I sure have.

13             THE COURT:  Very well.  So the complaint -- you will

14   at a point in time in the future, you will see it.  There's no

15   doubt, Mr. Gray.  The complaint, it has two parts.  The front

16   page lays out the nature of the complaint, or nature of the

17   charge, and then behind that is a -- is a -- an affidavit

18   prepared by a federal law enforcement agent on which the

19   government contends there's at least probable cause that you

20   committed this offense.  You are entitled to a preliminary

21   hearing at which the government would have to put on sufficient

22   evidence for me to find there is at least probable cause that

23   you committed this offense.  And if I find that, the matter

24   then goes to the grand jury.

25             Now, under the Seventh Amendment, you cannot be

1    convicted or tried on this charge unless the grand jury reviews

2    your case and decides that there's probable cause to issue an

3    indictment.

4               Do you understand this?

5               THE DEFENDANT:  Yes, sir.

6               THE COURT:  All right.  So if you waive your right to

7    a preliminary hearing or just consent based upon the -- what's

8    in the complaint, you don't waive anything.  It simply goes to

9    the grand jury.

10              Understanding that, Ms. Lee, how do you wish to

11   proceed as it relates to Mr. Gray on a preliminary hearing?

12              MS. LEE:  Your Honor, if the government is requesting

13   detention, we would request a detention hearing right now.

14              THE COURT:  Okay.  And a preliminary hearing as well?

15              MS. LEE:  Yes.  Thank you.

16              THE COURT:  All right.  Ms. Cleary, what's going to

17   be the government's position as it relates to detention?

18              MS. CLEARY:  We're requesting detention, Your

19   Honor.

20              THE COURT:  All right.  Are you ready to proceed now

21   with a preliminary and a detention hearing?

22              MS. CLEARY:  Yes, Your Honor.

23              THE COURT:  All right, very well.

24              All right.  Call your first witness, please.

25              MS. CLEARY:  Your Honor --

1        THE COURT:  Everybody have the pretrial services

2   report that it's been docketed?

3        MS. CLEARY:  Yes.

4        MS. LEE:  Your Honor, I have to apologize for being

5   such a nuisance to your entire staff on so many of these, but I

6   do think that we -- especially with Ms. Falatic have figured it

7   all out now.  She has started sending bond reports to an email

8   which we asked her to send them to, but that our parallels did

9   not know to check.

10        THE COURT:  Right.

11        MS. LEE:  So I do believe that we will be less of a

12   nuisance going forward on future -- future initial hearing

13   days.  And thank -- please thank every relevant person for

14   their patience with me.

15        THE COURT:  You would not do your job if you didn't

16   pursue the things that you thought were necessary.  And I spoke

17   to -- Ms. Lee, just so you'll know, I spoke to Ms. Williams --

18        MS. LEE:  You mean a week or two ago.

19        THE COURT:  Well, whenever it was, and we agreed

20   that, you know, once the pretrial services report is made

21   available to me and to the government, it absolutely needs to

22   be made available to the defendant, and so I think it was going

23   to be mailed over.  Because there is that problem that until

24   you're appointed you can't get into a --

25        MS. LEE:  Docket.

1      THE COURT:  -- sealed document, so...

2      MS. LEE:  Right.  Thank you.  Thank you.

3      THE COURT:  All right, thank you.

4      All right.  Ms. Cleary?

5      MS. CLEARY:  And Your Honor, I'm sorry, just to

6  clarify, are we proceeding with a preliminary hearing now or

7  the detention hearing?

8      THE COURT:  Well, we'll put them together.  It will

9  be a preliminary hearing and detention at the same time.

10      MS. CLEARY:  Got it, okay.  So we'll call Agent

11  Witt.

12      THE COURT:  All right.  Ms. Witt, if I can get you to

13  raise your right hand.

14      LYNNE WITT, CALLED BY GOVERNMENT, SWORN

15      THE WITNESS:  I do.

16      THE COURT:  All right.  Thank you very much.

17      Go ahead, please, Ms. Cleary.

18      MS. CLEARY:  Okay.

19                   DIRECT EXAMINATION

20  BY MS. CLEARY:

21  Q    Can you state your name for the Court, please.

22  A    Lynne Witt.  L-Y-N-N-E.  W-I T-T.

23  Q    And how are you employed?

24  A    I'm a special agent with the FBI here in Roanoke.

25  Q    And were you so employed and on duty and involved in the

1    investigation of Mr. Gray?

2    A    Yes.

3    Q    Can you tell us how you proceeded in that investigation?

4    A    Information law enforcement became aware of, a

5    peer-to-peer network -- excuse me.  A person utilizing a

6    particular IT address on a peer-to-peer file sharing network

7    that was requesting, downloading, information files that

8    represented child pornography.

9    Q    And you became --

10   A    So --

11   Q    Sorry.  You became aware of an IP address that was

12   requesting images of what law enforcement knew to be child

13   pornography.

14   A    Yes.

15   Q    Okay.

16   A    And so we further researched the owner of that IP address.

17   It was owned by Lumos Network, and further administrative

18   subpoena that was served to that subscriber was listed as

19   Jerald Gray with an address of 610 East Cedar Street,

20   Covington, Virginia.

21   Q    And is that within the Western District of Virginia?

22   A    It is.

23   Q    Okay.  And how did you proceed?

24   A    We then did further investigative steps to determine who

25   was indeed residing at 610 East Gray [sic] Street and

Witt - Direct                                                          13

1    determined that Mr. Gray was the resident there, amongst

2    another adult person that did verify that that was his current

3    address.

4    Q    And who all resided at that address?

5    A    There is his adult daughter lives there.  Would you like

6    me to name her?

7    Q    No, it's okay.  And anyone else?

8    A    And two minor grandchildren, the children of his adult

9    daughter.

10   Q    And how old are those children?

11   A    Approximately eight and seven years of age.

12   Q    And so when you arrived at that address, did Mr. Gray

13   indicate which computer was his?

14   A    So when we -- we -- a federal search warrant was obtained

15   and we -- for the residence of 610 East Cedar Street, and that

16   was executed on December 8.  And as a result of that execution

17   of the search warrant, Mr. Gray volunteered to an interview,

18   and in that interview identified his bedroom in the house and

19   that there was a computer system set up in there and he

20   described it to us during that interview.

21   Q    As being his computer.

22   A    Yes.

23   Q    And what did your search return on Mr. Gray's computer?

24   A    On scene the day of the search there were present two FBI

25   agent CART examiners, and through their analysis of that

1    computer system they were able to observe on the C drive the --

2    a file name with the peer-to-peer network that got us all

3    started for this where we had seen the user of this IP

4    requesting child pornography files.  And so they saw that

5    folder.  And so further into that was a downloads folder that

6    contained approximately 60 files.  I believe they are all video

7    type files and most with names that are indicative of child

8    pornography, CSAM.  Child Sexual Abuse Material.  Names

9    indicative of that.

10   Q    And you reviewed one of those files?

11   A    I did review one on scene that day, and I was subsequently

12   given a copy of -- a working copy of those approximate 60

13   files.  And I watched a different video, which is the one

14   outlined in the complaint that was described.

15   Q    Okay.  And so you all now have possession of Mr. Gray's

16   computer; is that correct?

17   A    Amongst other things, yes.

18   Q    Okay.  And those 60 files were downloaded in the folder

19   with the peer-to-peer network's name on his computer?

20   A    They were located in a folder named "downloads".

21   Q    Okay.  And so have you had the chance to fully

22   forensically analyze Mr. Gray's computer?

23   A    That has not been conducted by myself or others more

24   trained in that technique at this time.

25   Q    And so to date, the only thing you've gone through is the

1    downloads file from that folder with the peer-to-peer network's

2    name?

3    A    I've observed a few videos from that collection of 60

4    files.

5    Q    Okay.  And you said that those videos -- or the video that

6    you viewed on scene that day you would describe as CSAM?

7    A    Yes, or child pornography, yes.

8    Q    As child pornography, okay.

9         Now, on that day, December 8, did you all interview

10   Mr. Gray?

11   A    Yes.

12   Q    And what did Mr. Gray say during that interview?

13   A    He confirmed he had Lumos Network.  He confirmed where his

14   bedroom was in the house and described the computer set up

15   which matched with where the agents had viewed the peer-to-peer

16   network being used on that device.  He said he's the primary

17   user of that computer system.  He did admit to downloading

18   files from the peer-to-peer file sharing network that was

19   suspected of sharing those files at the very beginning that I

20   referenced.  He and then admitted to reviewing files that

21   were -- that appeared to be child pornography CSAM material and

22   that -- and so he -- that's what he had -- some of the

23   statements that he made during that interview.

24   Q    So following, was Mr. Gray offered a polygraph

25   examination?

1   A    He was offered during that interview and the arrangements

2   for a polygraph interview -- and the arrangements were made for

3   him to have that occur on the following day there in Covington.

4   And so he arrived himself to the place of the polygraph, and at

5   that point I introduced him to the polygrapher, and he, you

6   know, takes over that part of the process.

7   Q    And so following the polygraph, was another interview

8   conducted with Mr. Gray?

9   A    The polygrapher conducted a post-polygraph interview.

10  Q    Okay.  And what did Mr. Gray state during that

11  interview?

12  A    He admitted to -- first off, he -- he admitted to

13  having -- at first he admitted to having touched the breasts of

14  one of his daughter's friends, whose victim's -- whose name is

15  known to me, in approximately June of -- well, in 2005.  And so

16  he admitted to that, touching of her breasts in the overnight

17  hours.

18  Q    So let's talk a little bit more about that.  So during --

19  so during the interview he was asked about an incident in 2005

20  with a friend of his daughter's, and she was a juvenile at the

21  time; is that right?

22  A    Correct.

23  Q    We can call her initials "S.S.".

24  A    Okay.  In preparing for identifying everything about the

25  residence of 610 Cedar Street, obviously, we learned about

Witt - Direct                                                    17

1   Mr. Gray and also learned about complaint filed with Covington

2   Police Department in 2005 by the then, you know, minor victim

3   S.S.. And so I was privy to -- I was able to review her

4   statement provided at the time to Covington Police Department.

5   The report read they were not able to -- nothing ever was

6   adjudicated or charged from that, and I believe it was in

7   November of 2005. It was put into an inactive status by

8   Covington Police Department. And so given the nature of why we

9   were searching at 610 East Cedar Street, I wanted -- that is

10  why that was brought up with Mr. Gray during the interview

11  about that time frame and that incident

12  Q   Now, initially the statements that Mr. Gray has made to

13  the polygrapher, were those consistent with what you had read

14  in the report that was given by S.S. in 2005?

15  A   It was not completely consistent. His first statement to

16  the polygrapher stated he had touched the victim's breasts.

17  And in reviewing the victim's statement at the time in 2005,

18  she had reported that he had kissed her breasts. And so the

19  polygrapher addressed this issue with Mr. Gray, and Mr. Gray

20  did then reveal to the polygrapher that, yes, I did kiss her

21  breasts.

22  Q   All right. And at the time do we have an estimate of what

23  S.S.'s age might have been?

24  A   I think roughly 12.

25  Q   Okay. Now, was there another incident that Mr. Gray spoke

1   with with the polygrapher in terms of touching underage

2   women?

3   A    He referenced that there was a babysitter that would come

4   to their house -- and this was prior to the 2005 incident.

5   That would come to their house, and he referenced like playing

6   on the floor with her, and in that playing his hand would --

7   would touch her breasts long enough, but not too long.  And so

8   that is something else that he disclosed in his post-polygraph

9   interview to the polygrapher.

10  Q    Now, in speaking with the polygrapher, did he indicate

11  sort of what ages of young girls he was most interested in?

12  A    In the interview to us on December 8, he said, you know,

13  older teenage -- or not young children, but kind of that early

14  teen/preteenage is what he preferred.

15  Q    And did he make other statements to you-all or to the

16  polygrapher about seeing women in street, seeing girls in the

17  street?

18  A    He would describe incidences where he's out in a public

19  venue, such as a store or supermarket, and see an attractive

20  minor-aged female and then would later return home and

21  masturbate when thinking about that young female he had seen

22  previously.

23  Q    And what statement did he make about masturbating

24  involving the incident with S.S. in 2005?

25  A    I'd have to review the polygrapher's report to get more --

Witt - Direct                                                    19

1    to be more specific with that.

2    Q    Okay.  Was there anything else during your investigation

3    that Mr. Gray stated about either this incident -- or that he

4    stated about this incident in 2005?

5    A    Can you repeat your question?  Sorry.

6    Q    Was there anything else that Mr. Gray stated about the

7    incident in 2005 that we have not spoken about?

8    A    We -- we discussed from the victim's statement that was

9    made in 2005, she recounted Mr. Gray returning into the room a

10   second time and I think touching her -- her buttocks area.

11   When Mr. Gray was asked about that, he -- he couldn't remember

12   clearly if that had happened or not.

13   Q    Okay.  Okay, thank you.

14            MS. CLEARY:  We'll pass the witness, Your Honor.

15            THE COURT:  Before, Ms. Lee, you start

16   cross-examining, Ms. Witt, you testified that you reviewed a

17   video as described in the complaint.  Is that described in

18   paragraph 11 of the complaint?

19            THE WITNESS:  Yes, it is.

20            THE COURT:  Ms. Lee, is there any objection to me

21   reviewing paragraph 11 for the nature of that video or would

22   you rather have that on the record so you can cross-examine?

23   Of course, if you allow me to review it, it's certainly

24   available to your cross-examination as well, but --

25            MS. LEE:  I absolutely do not object to you reviewing

Witt - Cross                                                          20

1    paragraph 11.

2            THE COURT:  Okay.  All right.  Thank you very much.

3            Go ahead, Ms. Lee.

4                        CROSS-EXAMINATION

5    BY MS. LEE:

6    Q    When you first -- okay.  What's the first contact you had

7    with Mr. Gray?

8    A    Mr. Gray would have been on the morning of December 8.

9    Q    Was it by phone or in person?

10   A    It was in person.

11   Q    So you knocked on his door?

12   A    We executed a search warrant at his residence.  As a part

13   of that execution he was called out of the house.

14   Q    Okay.  What was his demeanor?

15   A    I would say calm.  I think, you know, wondering what was

16   going on.  And I would describe him as cooperative.

17   Q    Okay.  And you say you offered him a polygraph.  What do

18   you mean by offer?  Like normally when one offers something

19   it's for the other person's benefit.  You mean you asked him to

20   take a polygraph?

21   A    I did ask him if he would be willing to take a

22   polygraph.

23   Q    And what did you tell him was the purpose of that

24   polygraph?

25   A    The purpose was to be able to have the polygrapher derive

1    questions as it relates to any contact offenses that Mr. Gray
2    may have had with a minor, any sexual contact offenses he may
3    have had with any minor.
4    Q    You told him that was the reason; we want to know if you
5    have had contact with minors?
6    A    I believe that's what I told him, yes.
7    Q    Okay.  And he -- he agreed to do that.
8    A    He agreed and came back on the subsequent day voluntarily
9    to the police department for that.
10   Q    He never asked for an attorney or anything like that,
11   right?
12   A    No, he did not.
13   Q    Is it fair to say that if he had not told you about this
14   2005 situation you would not have known about it?
15   A    If I understood your question, that is incorrect.  I knew
16   about the 2005 incident from the police report made to
17   Covington Police Department.  So I knew that prior -- I knew
18   that prior to talking to him on December 8, if that was what
19   your question was.
20   Q    It was my question.
21   A    Okay.
22   Q    So you asked him about the 2005 incident?
23   A    Yes.
24   Q    And he told you an incomplete account.  Well, it's still
25   an account of him engaging in wrongdoing, right?

Witt - Cross                                                          22

1    A    On doing the interview on December 8, he did not admit to

2    that contact, or to the allegations made in the report.  He was

3    aware of the person's name as being a friend of his daughter's,

4    but he did not admit to the allegations that were in the police

5    report during his interview on December 8.

6    Q    Did he deny the allegations in the police report?

7    A    He did.

8    Q    But then he admitted them during the polygraph?

9    A    In a post-polygraph interview, yes.

10   Q    Was he asked during the polygraph "did you touch -- did

11   you ever touch S.S.?"

12   A    That was not -- that was not one of the -- he was given

13   two pertinent questions.  That was not it.  I would have to

14   look at the report to tell you the specific questions asked.

15   Q    At some point, though, in the course of -- I'm sorry, what

16   day was the polygraph?

17   A    The following day, December 9.

18   Q    Okay.  So between the 8th and the 9th, he admitted to the

19   conduct involving S.S.

20   A    In his post-polygraph interview he did make that

21   admission.

22   Q    Okay.  Do you know when in relation -- okay, let me back

23   up.

24        From what you know, S.S. was a guest at his house,

25   right?

1   A     Yes.

2   Q     She was visiting his daughter, who was at that time a

3   minor.

4   A     Yes.

5   Q     And let me just ask you another question:  Ms. Cleary

6   asked you whether he said -- what he said about ages that he

7   has felt sexually disposed towards.  And you used the word

8   "preteen".  He did not use that word, right?

9   A     I can't recall the exact wording that he used at this

10  time.

11  Q     He gave -- did he give specific ages to you?  Numbers?

12  A     I could -- I'd have to -- I think that came up in the

13  interview.  Without reviewing the notes or the interview, I

14  wouldn't want to say on the record without being able to

15  refresh my memory, but I do --

16  Q     Could you please look at your notes and refresh your

17  memory?

18  A     Yes.

19  Q     Thank you.

20  A     Within the notes I see that he referenced he's trying to

21  watch young teen girls.

22  Q     Okay.  So he didn't use the word "preteen".

23  A     That's not what was written in the notes by the

24  notetaker.

25  Q     Okay.  Were you present for that interview?

1   A    I was.

2   Q    Okay.  So the notetaker and you were both present.

3   A    Yes.

4   Q    Okay, thank you.

5        Could you please tell the Court -- and this is relevant to

6   the detention hearing part of it.  What kind of house does

7   Mr. Gray live in?

8   A    A modest house, two-story if you count maybe -- there's a

9   top level entry level story and then a basement level.  I would

10  describe the upper main entry level as where the bedrooms and

11  living area is and down below is a kitchen area.  I believe

12  that's where the rest room, the bathroom, is for the home and

13  some other storage type rooms.

14  Q    Do you know if he owns the home?

15  A    I do believe he owns the home.

16  Q    Do you know --

17  A    In comparison to like renting it, ma'am?  Is that --

18  Q    Yes.  Yes.

19  A    Owning, uh-huh.

20  Q    Okay.  Do you remember there was a dog there?

21  A    I don't recall a dog.

22  Q    Okay.  Did you find -- did you find any firearms on the

23  premises?

24  A    There was no firearms found.

25  Q    Was his adult daughter home at the time?

Witt - Cross                                                        25

1   A    She was.  Of the search, yes.

2   Q    Did you interview her?

3   A    I spoke to her very briefly, but I would say I didn't --

4   you know, I did not interview her.  And that was sort at the

5   end of things when she I think was going to be going off to get

6   food or, you know, sort of leaving -- leaving the area.

7   Q    Okay.  Where does Mr. Gray work, if you know?

8   A    He's employed by Waco, Inc., and as I understand it he

9   does railroad type work for the large -- I think it's a paper

10  plant or mill that is there in Covington.

11  Q    Did you arrest him today?

12  A    I did.

13  Q    Okay.  And he was at work, right?

14  A    When I -- I arrested him in the parking lot of the

15  Covington Police Department.

16  Q    Okay.  Could you tell the Court how that went.  Did you

17  call him from the parking lot?

18  A    I did call him from the parking lot.

19  Q    And what did you say --

20  A    And told him that I was -- I told him that I was there and

21  that I had a phone to return to him.

22            THE COURT:  You broke up there for a second there,

23  Ms. Witt.  You said you had a federal -- and then you broke up.

24            THE WITNESS:  So starting back, I said I called him

25  from the parking lot, the Covington Police Department parking

1   lot, and told him that I had a phone that I could return to him

2   there.  Did that answer your question?

3            THE COURT:  It did, thank you.

4   BY MS. LEE:

5   Q    Was that -- that was untrue?

6   A    I did not have a phone that I was going to be returning to

7   him, no.

8   Q    And I'm going to guess that you said that because if you

9   say we're here to arrest you he might not come outside; is that

10  right?

11  A    Agree to meet me.

12  Q    I'm sorry?

13  A    I said or agree to meet with me.

14  Q    Okay, I got it.  But in fact, when he came outside and you

15  made moves to arrest him, he did not run, correct?

16  A    He did not run, no.

17  Q    Okay.  I have one more question, if I can just remember

18  it.

19       The incident in 2005, it was reported --

20  A    I'm sorry.

21  Q    You're fine.  It was reported to the police, but Mr. Gray

22  was never charged with anything?

23  A    It's not reflected in the file, and nor did I see anything

24  of that on his criminal history in the Covington Police

25  Department.  I'm not aware --

Witt - Cross                                                        27

1   Q    Did you -- go ahead.

2   A    I'm not aware of him being charged for that based on

3   that --

4   Q    Did you talk to the Covington police about it?

5   A    I did.

6   Q    And they told you that they closed the case?

7   A    It just reflects that in November of that year it was put

8   into an inactive status, as they could not locate Mr. Gray, and

9   that's all I know.

10  Q    So the Covington records state that they closed the case

11  because they could not locate Mr. Gray, right?

12  A    I see the phrase "inactive status".  I don't know if that

13  means closed case in their language.  So inactive status.

14  Q    According to the Covington police, they placed the case in

15  inactive status because they could not locate him, right?

16  A    Yes.

17  Q    But from your search he's actually lived in Covington for

18  30 years, right?

19  A    I don't -- I think he's referenced living at that

20  particular address for 20.  Prior to that I'm not aware if it

21  was all in Covington to make 30 years.

22  Q    Okay.  So he's lived at the house since before 2005, and

23  he lives there now, right?

24  A    Yes.

25            MS. LEE:  That's all I have of this witness.  Thank

1    you.

2                THE COURT:  I don't believe I have any questions.

3    Actually, Ms. Witt, let me -- let me ask this:

4                Either through your interview or the polygrapher's

5    interview, was Mr. Gray asked any questions as to whether he

6    had had any contact with juveniles other than what was laid out

7    in the 2005 incident or what I'll call the babysitter incident?

8                THE WITNESS:  Without -- I could look at the report

9    and tell the Court the exact statements that I do believe

10   represented a broad question to sexual contact with minors.  So

11   he was asked about that through the polygraph questions.  I

12   do -- I will say that he denied any sexual contact offenses on

13   his grandchildren and on his daughter.

14               THE COURT:  Okay.  And the grandchildren are eight

15   and seven  What sexes are those?  Male, female.

16               THE WITNESS:  They are female.

17               THE COURT:  Both females, okay.  Do you know whether

18   the daughter is aware of the 2005 incident or the babysitter

19   incident that Mr. Gray has discussed in his interviews?

20               THE WITNESS:  I have not reviewed a report yet of the

21   conversations that she had the morning of the search with that

22   particular group.  I don't think that she talked about the 2005

23   incident.  And she briefly -- and previously when I mentioned I

24   spoke to her, very briefly before she departed she had vaguely

25   said something -- I remember something about a babysitter and I

1    knew nothing more than that.

2            THE COURT:  All right.  Thank you.  That's all the

3    question I have.

4            Ms. Cleary, does my question or Ms. Lee's questions

5    prompt any redirect?

6            MS. CLEARY:  Yes, Your Honor.

7                    REDIRECT EXAMINATION

8    BY MS. CLEARY:

9    Q    Special Agent Witt, can you describe -- so when you were

10   talking about the bedroom -- or, I'm sorry, the home, I think

11   you said that downstairs, the basement level, there is a

12   bathroom and storage.  So are all of the bedrooms on the same

13   level of the home?

14   A    That's how it appeared to me, yes.

15   Q    So there's no bedroom in the basement level.

16   A    Not that I observed.  I did not observe every room in the

17   house.  My primary time was spent with Mr. Gray.  But the two

18   bedrooms of the home were on the main -- main level, not the

19   basement level.

20   Q    And the grandchildren's date of births were in the years

21   2013/2014; is that right?

22   A    I believe that's correct.

23   Q    So they are somewhere in the seven, eight, nine range?

24           MS. CLEARY:  Okay.  Okay.  That's all, Your Honor.

25           THE COURT:  All right, thank you very much.  Thank

Falatic - Direct                                                    30

1   you, Ms. Witt.

2             All right.  Any other evidence, Ms. Cleary, other

3   than for me to take notice of the pretrial services report?

4             MS. CLEARY:  Just that, Your Honor.

5             THE COURT:  All right.  Thank you very much.

6             Ms. Lee?

7             MS. LEE:  Your Honor, I would like to ask just a few

8   questions of Ms. Falatic.

9             THE COURT:  All right.  Ms. Falatic, let me get you

10  sworn, if I could, please.

11            KIMBERLY FALATIC, CALLED BY DEFENDANT, SWORN

12            THE WITNESS:  I do.

13            THE COURT:  All right.  Go ahead, please, Ms. Lee.

14                         DIRECT EXAMINATION

15  BY MS. LEE:

16  Q    I know we've worked with compressed time, so you -- I'm

17  sorry.  Could you state your name and your job for the

18  record?

19  A    Kimberly Falatic, and I'm a supervising U.S. probation

20  officer here in the Roanoke office.

21  Q    Did you personally interview Mr. Gray on the phone for

22  this --

23  A    I did.

24  Q    -- presentence report?  Okay.

25       But you were unable to speak to anybody else about him

1    because --

2    A    Yes, I left a message for his daughter, and she literally

3    just called about ten seconds ago.

4    Q    Okay.  You were able to learn that she herself has an open

5    criminal case, correct?

6    A    Yes, ma'am.

7    Q    And what's that for?

8    A    Possession of a Schedule I or II controlled substance.

9    Q    That's personal use possession, from what you can see?

10   A    I do not know that.

11   Q    Well, it's possession.  It's not possession with intent to

12   distribute, okay.

13   A    Yes.

14   Q    Okay.  And do you know her age?

15   A    She is 28.

16   Q    28 years old.  And works at Wendy's, to the best of your

17   knowledge?

18   A    Yes, that's what Mr. Gray indicated.

19          MS. LEE:  Okay.  Court's indulgence.

20   BY MS. LEE:

21   Q    Did you find Mr. Gray cooperative and forthcoming in your

22   interview with him?

23   A    Yes, he was.

24          MS. LEE:  That's all the questions I have.

25          THE COURT:  Go ahead, Ms. Cleary.

1          MS. CLEARY:  No questions, Your Honor.

2          THE COURT:  Ms. Falatic, it appears as though -- you

3    were the interview officer.  You made a recommendation of

4    release?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  I'm going to ask a compound question.  If

7    I was a lawyer I would object to it, but I'm going to ask it

8    just so we can -- and that is:  First of all, can you tell me

9    why you recommended release?  Secondly, did you know about the

10   polygraph interviews and the contact?  And does that

11   information change your recommendation?

12         THE WITNESS:  I recommended release because he owns

13   his own home, he's been a resident of Covington for over 20

14   years, I think he's owned his home, and he's been in Virginia

15   for over 30 years, and he's employed full-time doing the same

16   work.  He was with one company, but that contract ended, and

17   that's why he transferred over to Waco, is because they

18   received a contract.

19         THE COURT:  Okay.  Secondly, did you -- you've heard

20   Special Agent Witt testify.  Did you know anything at all about

21   the polygraph interview and the 2005 and the babysitter

22   incident that she's discussed in her testimony?

23         THE WITNESS:  I was not aware of that prior to

24   writing and recommending bond in this case.

25         THE COURT:  How, if at all, does that affect your

1    recommendation in this case?

2              THE WITNESS:  Our concern would be the safety of his

3    grandchildren and the safety of the community at large for what

4    he has admitted during his polygraph interview, and I'm not

5    sure what conditions the Court could fashion to reduce that

6    risk now.

7              THE COURT:  Because the grandchildren live there

8    and -- in large part or --

9              THE WITNESS:  With his daughter working, there would

10   be no adult there to supervise him with contact with his

11   granddaughters.

12             THE COURT:  Okay.  Any questions -- we don't know

13   anything at all about -- all we know is what Ms. Witt has

14   testified to that he has denied any contact with his daughter

15   or granddaughters, correct.

16             THE WITNESS:  Yes, Your Honor.

17             THE COURT:  Okay.  I think that's all the questions I

18   have.

19             Ms. Lee, it was your witness.  Any further questions

20   of Ms. Falatic?

21   BY MS. LEE:

22   Q    In fashioning your initial recommendation, you also took

23   into account that he does not have a serious criminal history,

24   right?

25   A    Yes.

1   Q    And there was no evidence of failure to appear or anything

2   like that, right?

3   A    Correct.

4               MS. LEE:  That's all I have of -- everything else is

5   argument, and I think there's enough in the pretrial services

6   report to inform my argument.

7               THE COURT:  Okay.  Ms. Cleary, do my questions of

8   Ms. Falatic prompt any questions from your perspective?

9               MS. CLEARY:  No, Your Honor.

10              THE COURT:  All right, thank you.

11              All right.  Any other evidence, Ms. Lee?

12              MS. LEE:  No, Your Honor, thank you.

13              THE COURT:  All right.  Ms. Cleary, argument?

14              MS. CLEARY:  Your Honor --

15              THE COURT:  Let me ask one question just real quick.

16              Ms. Lee, do you submit on probable cause or do you

17  want me --

18              MS. LEE:  Yes.  Yes, I submit on probable cause.

19  Yes, I do.

20              THE COURT:  Okay.  All right.  Go ahead, Ms. Cleary.

21  Focus on just detention.

22              MS. CLEARY:  Right, so just for detention.

23              So Your Honor, the government is going to ask that he

24  be held in this case, and this is exactly for the reasons that

25  were stated previously, which is that the government is not

1    concerned that Mr. Gray is a flight risk.  It's true that he's

2    owned his home, that he stayed in the same community for this

3    many years.  The biggest concern for the government is that he

4    is a danger to the community because of this 2005 incident.

5    This is something that was reported in 2005 by this minor, who

6    was a friend of his daughter's, who was at the house for a

7    sleepover.  That police report, which he was ultimately

8    confronted with after not one but two but the third time,

9    Mr. Gray did ultimately admit that this has happened; that this

10   was not just a casual touching.  This goes far beyond this.  He

11   is ultimately kissing a prepubescent girl's breasts.  Now, this

12   is consistent with what he's told law enforcement in terms of

13   what he's -- quote, unquote -- attracted to.  He said that he's

14   attracted to prepubescent girls.  So in this, you know, 13, 14,

15   15 age range.  And given that his daughter lives in the home

16   with him and that his granddaughters both live in the home with

17   them and that they are quickly approaching that range and that

18   he frequently will be out in public and he'll see women of

19   that -- young girls of that age range and continue to be

20   attracted to them, the government just believes that given all

21   of this he is a risk to the community.  He's in a home with two

22   young girls.  They are all in bedrooms that are on the same

23   floor and very close together, and the government believes that

24   it would be best that he's detained until his trial.

25            THE COURT:  Thank you, Ms. Cleary.

1      Ms. Lee?

2      MS. LEE:  Your Honor, what would be best is not a

3  test.  This is not a presumption case.  It's a presumption of

4  release unless no combination of conditions could be

5  established to assure the safety of the community.

6      The government is hanging its hat on an uncharged

7  conduct that occurred 16 years ago but is suddenly concerned --

8  I mean, the police who investigated it were not concerned

9  apparently at all.  After three months they said they couldn't

10  find the subject.  And honestly, that's the craziest thing I've

11  ever heard.  I've never heard of the police dismissing a case

12  because they can't find the culprit.  Especially when he's not

13  even anywhere -- right in front of them.  I'm not saying that

14  the 2005 incident didn't happen and should not give the Court

15  some concern that should translate into the Court's imposing

16  conditions designed to protect the community, but --

17      THE COURT:  Help me understand what those conditions

18  are, because I think that's what Ms. Falatic said was her

19  concern.

20      MS. LEE:  Yes.

21      THE COURT:  Was how do we protect the

22  grandchildren.

23      MS. LEE:  Okay.  I'm going to be candid.  I told

24  Mr. Gray "Judge Ballou is not going to want you living with

25  your children pretrial".  I could sit here and argue, no, they

1   are outside of his, you know, apparent preferred range, but,

2   you know, the Court has to be concerned, and I'm not going to

3   deny that.

4        Mr. Gray I can proffer does own his home outright.

5   He is not paying a mortgage on it, and he has an excellent job

6   that provides him with an income.  And there's a subplot here

7   which is that he supports -- he financially supports his

8   daughter and granddaughters at the home.  She works at Wendy's,

9   but it's hard to make a living at Wendy's.  So I would grant

10  that the Court -- it would be reasonable for the Court to want

11  to ensure a separation between -- even though there's been no

12  allegations of anything for 15 years, and there has not been --

13  and he was polygraphed.  I wish I could do it over and tell my

14  clients don't ever, you know, submit to a random polygraph,

15  especially when they are executing a search warrant on your

16  home.  But the facts are what they are, and he did submit to a

17  polygraph and he was confronted with events from his past.  But

18  even that polygraph did not yield any information regarding any

19  conduct occurring in the last 16 years.  And that's a huge

20  period of time.  So whatever --

21        THE COURT:  We don't know -- and what we don't

22  know -- we know what his answers were, and Ms. Cleary

23  rightfully did not ask what the polygraph results were because

24  I don't think that's --

25        MS. LEE:  Yes.

1    THE COURT:  -- something I can consider.  So we know

2    what his answers were, but I don't know what the polygraph

3    revealed.

4         MS. LEE:  Right.  But we have the post polygraph --

5         THE COURT:  Interview, right.

6         MS. LEE:  -- confrontation that yielded this

7    information.

8         THE COURT:  Correct.

9         MS. LEE:  So where we are is that we do not have any

10   information regarding any contact offense for 16 years.  We

11   have him charged with an offense that does not create a

12   presumption of detention, and we have all the traditional

13   indicia of dangerousness and risk of flight in his favor.  He's

14   got the stable job of many years.  He's got the home that's

15   paid off.  He's got an absence of committing offenses on

16   release.  He's got an absence of failing to appear.

17        I would respectfully -- and I -- I'm not being as

18   zealous on his behalf as I could be, but I'd respectfully ask

19   that the Court release him, and I would not object to the

20   Court's imposing a requirement that he not have any

21   unsupervised conduct with any children, including those in his

22   own family, or any other children, obviously, which are not --

23   which are not -- I mean, that's a gimme, but the Court would

24   have to give to provide that condition.

25        I don't think there's any reason to believe or to

1   question that he would be able to sustain that in this pretrial
2   period.  He would go to work.  I believe that he would have to
3   get himself an apartment or similar for this pretrial period.
4   I believe he'd have to move out of his home for this pretrial
5   period, or his daughter and children would have to move out,
6   but I don't think that would be fair to them.  And I've warned
7   him that I was going to suggest that in an effort to allow the
8   Court to fashion conditions that would agree -- reasonably
9   show -- again, the test does not guarantee the safety of the
10  community.  The test is reasonably sure.  But if he were to
11  move out of his home, and given the age of the allegations, I
12  would -- I would respectfully request that as a condition.
13          THE COURT:  All right.  Thank you, Ms. Lee.
14          Ms. Cleary?  And I think you can address your -- your
15  comments to the issue of if -- and I'll put it this way:
16  Whether he moves out or his daughter and children move out, if
17  Mr. Gray lives in a place by himself free of the internet, free
18  of anything along those lines, what is the government's
19  position then?  In other words, with electronic monitoring and
20  no contact with children, what is -- what's the government's
21  position at that point?
22          MS. CLEARY:  Your Honor, the first thing the
23  government is going to point out is that presently -- and I
24  think that this has come up very quickly, but there seems to be
25  no plan for Mr. Gray to move out.  It would be difficult to

1   figure out a way in which, you know, his adult daughter who is

2   raising two minor children to be able to all of a sudden leave

3   and be someplace else.  Either they live someplace else or he

4   lives someplace else on simply his meager salary.

5          And in the midst of this keeping in mind that -- and

6   I don't know what their custody status would be, but certainly

7   keeping in mind that his daughter does have this pending court

8   date in January of this year for her felony charges as well.

9          But in terms of Mr. Gray living by himself, and what

10  the government wanted to address in regards to Ms. Lee's

11  argument as to the fact that this is not a presumption case,

12  currently, just to situate this case into kind of larger

13  statute and case law here, currently Mr. Gray is only charged

14  with one count of possession of child pornography.  However,

15  given what Special Agent Witt has testified to today, there

16  were 63 downloads that were found on Mr. Gray's computer.

17         Now, so I think technically -- you know, he could

18  have been charged with 63 counts of possession of child

19  pornography.  But in addition to that, the vast -- or however

20  many images or videos that are actually on his computer are

21  presently unknown.  So the only thing that we're aware of at

22  this moment is this very brief interview with the -- with

23  the -- with the person who conducted the polygraph, the

24  polygrapher, in addition to these 63 images.

25         Now, technically -- I'm sorry.

1      THE COURT:  But from a -- from my perspective and

2   your burden of establishing that clear and convincing evidence,

3   is it all that I can go on either -- not either, but what he's

4   been charged with, not with what's possible.

5      MS. CLEARY:  Yes.  No, no, I understand.  I

6   understand.  But I will just point out -- you know, since

7   technically Mr. Gray wasn't charged -- wasn't ever fully

8   charged -- or wasn't ever charged period with that 2005

9   incident, but what I was just going to point out was that if

10  Mr. Gray had been charged with a download, which is -- or with

11  receipt of child pornography which can be shown through these

12  downloads, there is a presumption against bond in that case.

13      THE COURT:  Right.

14      MS. CLEARY:  And so that's -- that's what I was going

15  to say, and that's what I was going to point out.  I believe

16  that given the posture of child pornography cases that there is

17  a difference when somebody is willing to cross the line and

18  physically touch a young child, and I think that Mr. Gray has

19  shown that he is capable of doing that and that he has this

20  pattern.  And again, we just have these 61 images, but that

21  certainly doesn't mean that there could be more.  And he's only

22  been charged with one.  And I understand that that's all that's

23  before the Court today, but what the Court knows is that he is

24  somebody who has openly admitted in the last couple of weeks to

25  spending the last 15 years sexually attracted to young women,

1   to seeing young women or young girls out in public to see -- to

2   being -- to masturbating to the thought of prepubescent girls

3   and then ultimately to, you know, creating and constructing

4   interactions where he can touch them, including, you know, when

5   they are asleep.  So given that we know that this happened in

6   2005, and we know that he admitted to, you know, the babysitter

7   incident as we're calling it and we know that he has access to

8   children, I believe that he's still a danger to the community

9   given all of this information and that he should be detained.

10          THE COURT:  All right.  Thank you very much,

11   Ms. Cleary.

12          MS. LEE:  Your Honor, to be clear, I am not asking

13   the Court to release him and requiring the daughter to move

14   out.  I am saying he could --

15          THE COURT:  He could move out.

16          MS. LEE:  He would need to find a place.  He would

17   need to move out effective the minute he were released,

18   including temporary lodging until he could find a suitable

19   apartment.

20          THE COURT:  Right.

21          MS. LEE:  And I'm not going to address Ms. Cleary's

22   argument that the Court should treat it like a presumption case

23   because they could have charged it differently, because I think

24   that's --

25          THE COURT:  I can't do that.

1        MS. LEE:  -- not valid.

2        THE COURT:  Yeah, I cannot do that.

3        So here's where I am, Mr. Gray.  First of all, in the

4   bond cases there are really only two questions in front of me.

5   One is are you a flight risk, and, secondly, are you a danger

6   to the community.  There's not any issue here, and the

7   government does not argue, that you are a flight risk.  And so

8   the issue is whether you're a danger to the community.  That's

9   something that the government must prove by clear and

10  convincing evidence.

11       In that regard, there's been a lot of bantering back

12  and forth as to whether there's a presumption that you are to

13  be detained.  Given the way which you are presently charged,

14  that you're -- there is not a presumption that you are to be

15  detained.  You're charged with one count of possession of child

16  pornography as laid out in paragraph 11 of the complaint.  As

17  it relates to that, there is evidence -- there is probable

18  cause that you committed this offense.  I'm going to send that

19  to the grand jury

20       With respect to the conditions of detention versus

21  release, the factors I consider are this:  One is the nature of

22  the offense, and that is that you had in your possession child

23  pornography.  They were in a file folder with many -- and I'll

24  say many because I don't believe Ms. Witt testified that every

25  I guess file name was consistent with child pornography, but

1   many of them were.  She has reviewed one video that she didn't

2   describe in detail on scene and then one video that was

3   provided to her that's described inside the criminal complaint.

4   But the circumstantial evidence would suggest it is consistent

5   with possession of much child pornography.  And with thorough

6   forensic evaluation of the evidence that was seized will

7   yield -- will yield an answer to that.

8          The evidence further consists that you are employed.

9   You own your home.  You have a good job.  You do not have a bad

10  criminal record.  I think there was -- I've got the criminal

11  record up here.  It shows that you had one prior felony in 2013

12  in which you were on supervised probation.  Are you off

13  supervised probation at this time?

14          THE DEFENDANT:  Yes, sir.  It was only three year

15  probation.

16          THE COURT:  All right.  So three years suspended and

17  three years probation.  All right.  And you had one other

18  charge in 2000 and another one in 1993 when you were much --

19  much younger.

20          The evidence that is -- and based upon that evidence

21  the government -- not the government, but probation had

22  recommended your release upon condition.

23          The evidence before me is what was yielded in this

24  post-polygraph interview and the interview at the time of the

25  search with Ms. Witt that suggests that there are two

1   incidences in which there is conduct with a minor and -- and

2   that you have remained sexually attracted and have at least

3   acted with yourself in response to that attraction of sexual

4   minors -- of minors.

5          Based upon that and the evidence of going forward and

6   the number of files that were found, I do find you to be a

7   danger to the community.  I don't -- and what I would want to

8   consider, Ms. Lee, is whether there is a separate home plan.

9   Rather than simply release Mr. Gray and say you've got to go

10  live somewhere else, whether there is a separate home plan that

11  can be -- that can be fashioned in that regard.  But I also --

12  Ms. Witt, how long will this forensic evaluation be?

13         AGENT WITT:  I can't speak to that.  There were two

14  sort of computer hard drive towers, if you will, that will need

15  to be sent to Richmond to be evaluated by the CART agents, and

16  I'm hoping to be able to review some of the more external

17  storage datas that were seized here locally.

18         THE COURT:  Okay.  Well, so my ruling at this time,

19  Ms. Lee, is that the evidence before me establishes by clear

20  and convincing evidence that Mr. Gray is a danger to the

21  community, but the present home plan of either living with his

22  daughter and grandchildren -- which is not exactly what you're

23  saying, I recognize that -- is not acceptable and nor is it --

24  nor is a home plan of I'm going to release you and you've got

25  to find out -- figure out a place to live that's -- that does

1    not have minors there is likewise not acceptable.

2              I will allow you to come back and consider another

3    home plan, but I -- I am -- I'm also concerned about the extent

4    to which there is information if there are 60 files.  There is

5    no evidence right now in front of me as to the timing of when

6    that -- when that came back and when it was -- when they were

7    obtained.  I'll use those terms.  I don't draw any conclusions

8    one way or the other.

9              MS. LEE:  I have to gently object to the Court's sort

10   of taking an interest to when the evidence is going to be

11   available.  The government has -- the rest -- the government

12   decides when he gets arrested and the government --

13             THE COURT:  I agree with that.

14             MS. LEE:  -- goes forward on the evidence that it has

15   that day.  There's no provision to like let's see what else the

16   government can get.

17             THE COURT:  I'm not -- I'm not waiting for that.

18             MS. LEE:  Okay.

19             THE COURT:  What I'm concerned about is the fact that

20   there is -- there are a number of files.  There's evidence of

21   ongoing sexual interest between 2005 and 2021 of young -- young

22   girls and acting on that with himself after seeing young girls

23   and that there was contact in 2005 and maybe before.  And so

24   that concerns me a lot, that -- and so I'm not sure that even

25   living alone takes care of that issue.  So, you know, I'm not

1    asking the government to produce more evidence.  I think

2    you're -- you're right about that.  And that would be

3    inappropriate for me to do that.

4            MS. LEE:  The problem is the loss of his job, Your

5    Honor.  The loss of his job is going to have direct

6    consequences for him, obviously, but also his daughter and

7    grandchildren who are not currently involved in this case in

8    any way.  And I -- it just -- I think that that's -- it's not

9    helpful to us as a society to take somebody who has not been --

10   I mean, with all -- we all get sick listening to this type of

11   evidence, but we still have to separate what's illegal and

12   what's not illegal.  And masturbating is not illegal in any

13   universe.  The Court can only consider it to the extent that he

14   may act on it, and there's no evidence before this Court going

15   back 16 years of him ever acting on it.  So to say you're

16   losing your job, you're going to sit in jail, even though

17   you're ostensibly presumed innocent of the criminal charges, is

18   a net loss in this kind of -- you know, this economic crisis

19   that we're all in because of COVID, but he's -- his children,

20   his daughter and his grandchildren, especially if his daughter

21   has an addiction problem that she's struggling with and we're

22   just sort of -- we're making things worse for the world,

23   including the very people we're supposed to be protecting,

24   which is his daughter and his grandchildren.

25            I don't see any limitation on the Court's ordering

1  him to not go home.  That happens all the time in domestic

2  abuse cases, yes, I'm releasing you but you can't go home.  The

3  person goes and takes their credit card and goes to a motel

4  until they find themselves a suitable studio apartment.

5          THE COURT:  I can tell you in the time that I've been

6  here, I've not released somebody without an established home

7  plan.

8          MS. LEE:  That's true.  This Court has not.  But in

9  other -- in a non -- I can certainly say that from other

10  districts in a nonpresumption case it happens all the time.  I

11  do agree that this Court has not done that.

12          THE COURT:  Correct.

13          MS. LEE:  But also we're putting this gentleman in

14  this ridiculous position of having to fashion a home plan

15  without having -- you know, we can see from his pretrial

16  services report he does not have family members he is close

17  with nearby.  He can't go live with his mother or whatever one

18  normally does in this situation.  So he's in a position where

19  from jail he's supposed to be arranging new homes that I can

20  present it to the Court, and I just --

21          THE COURT:  His daughter -- his daughter may be able

22  to help him to do that.  I mean --

23          MS. LEE:  That's true.  That is true.  That is true.

24  And I'm going to reach out to her.  Okay, thank you.

25          THE COURT:  Okay, all right.  Thank you.

1    MS. LEE:  So the Court is saying "no home plan, I

2    can't reject him, but you come up with a home plan you can at

3    least file a motion" --

4    THE COURT:  I'll consider --

5    MS. LEE:  Okay, thank you.

6    THE COURT:  You don't need to file a motion.  Just

7    ask -- ask Ms. Davis or Ms. Ayersman.  Ms. Brown is out this

8    week.  I'm here this week and next week, and then I've got two

9    weeks that are going to be -- that I'm going to be

10   unavailable.

11   MS. LEE:  Which is richly -- your unavailability will

12   be richly deserved by you.  And if Ms. Brown is in like Hawaii

13   right now, then God bless her, because she works too hard.

14   THE COURT:  My unavailability may be more appreciated

15   by others than most.

16   Mr. Gray, in all seriousness, if you disagree with my

17   decision, you do have a right to appeal any decision to a

18   presiding district judge, we'll assign it.  Since it's a

19   criminal complaint at this time it does not have a judge

20   assigned, but we would assign it to a judge if you wish to

21   address it, so...

22   MS. LEE:  Oh, we just lost the judge.

23   THE CLERK:  I probably clicked a wrong button.

24   MS. LEE:  That's a first.

25   Brittany, will it be possible if we could talk to him

1    briefly after court adjourns?

2               THE CLERK:  Sure.

3               MS. LEE:  Thank you.

4               PROBATION:  Christine, do you need his daughter's

5    phone number?

6               MS. LEE:  Oh, yeah.  That's actually what I was going

7    to ask him for, but I don't want it on the --

8               PROBATION:  I was going to say, well, I have to wait

9    until the public line goes off.

10              MS. LEE:  You can even email it to me.

11              PROBATION:  I'll email it to you.

12              MS. LEE:  Okay, thank you.

13              THE COURT:  I'm sorry I got disconnected.  I was

14   saying, Mr. Gray, you do have a right to appeal my decision to

15   the presiding district judge.  We will assign a judge if you

16   wish to do so, but that will be my decision.

17              All right, very well.  Anything else we need to

18   address, Ms. Cleary?

19              MS. CLEARY:  No, Your Honor.

20              THE COURT:  All right.  Ms. Lee?

21              MS. LEE:  No.  Mr. Gray, if you can just call my

22   office Monday morning, I'd be grateful.

23              THE DEFENDANT:  All right.  How do I get ahold of

24   you?

25              MS. LEE:  You tell them it's a Federal Public

1    Defender and they will put you through, and they should make it

2    free for you.

3              THE DEFENDANT:  All right, thank you.

4              MS. LEE:  Thank you.

5              THE COURT:  All right, thank you.

6              We'll stand in recess.  Thank you.

7              MS. LEE:  Thank you.

8              MS. CLEARY:  Thank you.

9              (The proceedings concluded at 4:19 p.m.)

10                        **CERTIFICATE**

11             I, Mary J. Butenschoen, do hereby certify that the
       foregoing is a correct transcript of the electronic recording
12     in the above-entitled matter.

13                   _____/s/_____1/10/2022
                     Mary J. Butenschoen, Transcriber

14

15

16

17

18

19

20

21

22

23

24

25